IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Tina Terry, | Case No. 3:14 CV 1736 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Chrysler Group, LLC, et al., | |
| Defendants. | |

### INTRODUCTION

Plaintiff Tina Terry brings this action against her former employer, Defendant Chrysler Group, LLC (now known as "FCA"), and her union, Defendant United Auto Workers of America (the "Union"). She alleges a hybrid Section 301/fair-representation claim, employment discrimination, and intentional infliction of emotional distress related to her employment. Defendants move for summary judgment (Docs. 34 & 37), and Terry opposes (Doc. 41). For the reasons below, this Court grants the Motions.

### BACKGROUND

Terry began working for FCA in 1985 (Terry Dep. I (Doc. 35-1) at 5). In January 2013, she became a team leader on the production line (*id.* at 12). As a team leader, a bargaining unit job, her responsibilities included entering attendance records, keeping the area clean, and making necessary repairs (*id.* at 19).

Terry's tenure as team leader was rocky from the word "go."  Another high-seniority team member routinely called her profane names, and the rest of the team showed her little respect (*id.* at 21).  Her team was among the lest productive because it led the facility in repairs (*id.* at 133), which she believed was due to her team members working against her by sending excessive repairs down the line (*id.* at 92, 127; Reffigee Dep. (Doc. 36-6) at 13).  Terry and her team members regularly complained about each other to management (Reffigee Dep. at 12–13).  Both the Union and FCA addressed these complaints (*id.* at 13, 46; Alexander Dep. (Doc. 36-4) at 2), including transferring the employee whom Terry identified as the primary instigator to another area (Terry Dep. I at 26–27; Reffigee Dep. at 47).  But the situation did not improve, and Terry's supervisor, Dedrick Reffigee, continually criticized Terry for her team's performance (Terry Dep. I at 35).

These problems came to a head in November 2013.  Terry stayed past her shift to finish repairs (*id.* at 36), using tools the next shift needed to start their work (Reffigee Dep. at 20).  She returned most of the tools after she finished, but inadvertently took a magnetic tool home with her (Terry Dep. I at 36).  Another employee, without the benefit of the magnet, injured her hand trying to remove a screw (*id.* at 36–37; Reffigee Dep. at 20).  The next day, Reffigee told Terry he was removing her as team leader (Reffigee Dep. at 20).  Terry filed a grievance seeking reinstatement, which the Union pursued through the third stage of the grievance process.  The Union ultimately withdrew the grievance, however, because the team was dissolved and the leader position eliminated (Alexander Dep. at 5).

While her grievance was pending, Terry became a floater on the cert line (Terry Dep. I at 43–44), a high seniority area composed largely of workers with thirty years' experience (Alexander Dep. at 4).  As a floater, she filled temporary openings on the line, but could not bump other workers

off the line (*id.* at 5). If there were too many floaters to fill the openings, Terry had the option to fill the job -- if she had the required seniority -- or go home (Terry Dep. I at 44). If there were no openings, she would be sent home.

In January 2014, the unit leader tasked with filling temporary openings did not assign Terry a job (*id.* at 47). Terry became upset because she felt her seniority entitled her to an assignment (*id.*). She went to the union office to complain, where she met Mark Hepfinger, Mike Dazell, and Mark Epley (*id.*). Though she was crying so hard she could hardly talk, Terry told Hepfinger she "couldn't take no more" and said the unit leader was violating her seniority (Terry Dep. II (Doc. 35-4) at 34–35). Dazell asked Terry what was wrong, but she told him to "shut up" (*id.* at 35). According to Terry, Dazell then "got toe to toe, knee to knee with [her], and he said 'you don't tell me to shut up' and spit while he was talking" (*id.* at 36). Terry told him he was spitting on her, and Dazell denied it before spitting again (*id.*). Terry alleges Dazell backed her into a corner during this exchange (*id.*). Dazell denies spitting at or cornering Terry (Doc. 34-2 at 2). Epley then told Terry to go home (Terry Dep. II at 36). Terry went to the hospital and was admitted to the psychiatric ward, where she stayed for nine days (Terry Dep. I at 49). She never filed a grievance over this incident (Terry Dep. II at 36).

## STANDARD OF REVIEW

Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It may not weigh the evidence or make credibility judgments. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). But "[t]he mere existence of a scintilla of evidence

3

in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Expert Masonry, Inc. v. Boone Cty, Ky.*, 440 F.3d 336, 341 (6th Cir. 2006) (internal quotation marks omitted).

## DISCUSSION

Terry brings four counts against the Union and FCA. The first count alleges the Union breached its duty of fair representation, while the second alleges FCA breached the collective bargaining agreement ("CBA"). Together, these counts state a hybrid claim under Section 301 of the Labor Management Relations Act. In the third count, Terry accuses Defendants of discriminating against her on the basis of her disability in violation of Ohio law. Lastly, Terry asserts a claim of intentional infliction of emotional distress against Defendants for alleged mistreatment during her employment.

**Hybrid Section 301 Claim**

Terry alleges FCA violated the terms of the CBA by summarily removing her from her position as team leader. She also claims the Union breached its duty of fair representation by failing to (1) pursue the grievance she filed related to her removal, and (2) file a grievance on her behalf relating to FCA violating her seniority in assigning floater jobs (Doc. 1-1 at ¶ 10). These claims comprise a "hybrid [Section] 301 suit[, which] implicates the interrelationship among a union member, his union, and his employer." *Vencl v. Int'l Union of Operating Eng'rs*, 137 F.3d 420, 424 (6th Cir. 1998). "To recover against a union under [Section] 301, the union member must prove both (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation." *Id.* "If both prongs are not satisfied, Plaintiff[] cannot succeed against

any Defendant." *Garrish v. UAW*, 417 F.3d 590, 594 (6th Cir. 2005).  Here, both prongs prove fatal to Terry's claim.

***Breach of Contract***.  Terry claims FCA violated the CBA when Reffigee summarily removed her from her position as team leader.  She attaches to the Complaint an excerpt of an agreement -- which she claims was in force at the time -- that provides for the selection and removal of team leaders (Doc. 1-1 at 18–19).  FCA, through the Declaration of its Toledo plant labor relations manager, asserts the agreement attached to Terry's Complaint expired on November 4, 2011, some two years before the events in question (Doc. 36-2 at 2).  Further, FCA argues the agreement that was in effect at the time of her removal (*id.* at 10–32) includes no rules regarding removal of team leaders (Doc. 37-1 at 11–12).

Terry responds in two ways, both unavailing.  First, she notes the agreement advanced by FCA requires ratification and, because nothing in the record other than FCA's self-serving Declaration shows when it was ratified, a dispute of fact exists as to which contract was in effect at the time (Doc. 41 at 8).  But Terry cannot create a question of material fact simply by doubting the truth of a sworn statement, and she points to no evidence in the record either calling the Declaration into doubt or supporting her own initial assertion that the earlier contract governed.  *See* Federal Civil Rule 56(c)(1) & (e).  Moreover, Terry offers no persuasive reason to doubt the Declaration's veracity, particularly considering the document was initialed in March 2013 and listed an effective date of November 4, 2011 (Doc. 36-2 at 2, 10–11).

Second, she argues that FCA may have violated even the later contract.  Terry notes the newer contract "included an annexed letter, Letter 124, which provided that both management and union would conduct the team leader program as a joint venture and established a council to review

5

activities" (Doc. 41 at 9).  Reffigee's unilateral removal of Terry violated Letter 124, the argument goes, because "[n]o joint council reviewed the removal of Ms. Terry from the team leader position" (*id.*).  Terry reads far too much into Letter 124.  The Letter creates a National World Class Partnership Council, which "*may* review aspects of the [employee participation] model such as the Team Leader selection and removal *process*" (Doc. 36-2 at 31 (emphasis added)).  It also provides for the creation of local councils "as a means to facilitate and promote the joint implementation of" the new employee participation model (*id.*).  Nowhere, however, does it require either the national or local council to review an individual team leader's proposed removal.  With no other contractual provision to point to, Terry's breach-of-contract claim fails.

*Fair Representation*.  Though the failure of the breach-of-contract prong dooms Terry's hybrid claim, *see Blesedell v. Chillicothe Telephone Co.*, ___ F.3d ___, 2016 WL 279433, at *7 (6th Cir. 2016), this Court nevertheless considers the fair-representation prong.  The Union first notes that Terry cannot pursue a fair-representation claim relating to the alleged violation of her seniority as a floater because she never filed a grievance or otherwise tried to initiate the grievance process.  "[T]he duty is on the employee to initiate [her] grievance, and, not having done so, [s]he cannot here subject [her] union to liability."  *Steen v. UAW*, 373 F.2d 519, 520 (6th Cir. 1967) (internal quotation marks omitted) (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965)).  Terry offers no argument in response (*see* Doc. 41 at 9–10).

The Union next argues Terry fails to show a genuine dispute as to whether it fairly pursued her grievance relating to her removal as team leader.  To show a breach of the duty of fair representation, Terry must demonstrate "the union's actions or omissions during the grievance were arbitrary, discriminatory, or in bad faith."  *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th

6

Cir. 2003). "There is no requirement . . . that the grievance process be 'error-free.'" *Id.* Terry complains that she was never notified that the Union was withdrawing the grievance after the third stage, and appears to argue her treatment in the union office shows the Union treated her with "a pattern of hostility" (Doc. 41 at 10). As the Union argues, however, Terry's isolated exchange with Hepfinger, Dazell, and Epley -- over an issue completely unrelated to her earlier grievance -- does not present a question of material fact as to whether that hostility tainted the Union's representation of Terry through the grievance process. *See VanDerVeer v. United Parcel Serv.*, 25 F.3d 403, 405 (6th Cir. 1994) ("Personal hostility is not enough, however, to establish a *prima facie* case of unfair representation in a union member's discharge if the union's representation during the disciplinary steps is adequate and there is no evidence that the personal hostility tainted the arbitrators' decision."). While the Union officials' behavior as described by Terry is regrettable, Terry fails to connect the dots between that conduct and the withdrawal of her grievance seeking reinstatement to a position that had been eliminated.

**Employment Discrimination**

Terry next argues Defendants discriminated against her on the basis of her disability, work-related stress and depression (Doc. 1-1 at 12–14). Terry brings her claim under Ohio's civil rights law, which mirrors federal law in all relevant respects. *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004). Accordingly, Terry must first establish a *prima facie* case of discrimination by showing: "(1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse action; (4) the employer knew or had reason to know of her disability; and (5) she was replaced or the job remained open." *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012). Should Terry make out a *prima facie*

7

case, the burden shifts to Defendants to provide a legitimate, non-discriminatory reason for the employment action. The burden then shifts back to Terry to show the proffered reason is a mere pretext for discrimination. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).

Defendants focus their arguments on the first and fourth prongs (Doc. 34 at 8–9; Doc. 37-1 at 11–14). They contend Terry cannot establish she is disabled by showing she "(1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, [and] (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment." *Talley*, 542 F.3d at 1105. Nothing in the record suggests Terry was diagnosed with depression until after the last day of her employment (Doc. 37-1 at 12). Defendants maintain Terry's employment history belies any assertion that her alleged disability substantially limited her work (*id.*; Doc. 34 at 8), and deny knowing or having reason to know Terry suffered from depression.

Quizzically, Terry first responds by pointing to a number of *physical* ailments she suffered over the years, including carpal tunnel surgery and pain in her neck, shoulders, and back (Doc. 41 at 11). Though she argues Defendants were aware of these issues, she fails to explain how that relates to a disability claim based on her depression. Terry's medical records do show she had a history of depression beginning in February 2013 (*see* Doc. 41-1 at 1; Doc. 41-3 at 1), which she contends substantially limits "her sleep, concentration, focus, cognitive abilities, interaction with others, functioning with her family members and friends, ability to enjoy activities, increased worry, her ability to care for herself including using proper hygiene, and interest in activities or going places outside of the workplace" (Doc. 41 at 12). She also maintains Defendants knew of this depression

8

because she had reported work-related stress, pointing to an FCA memo from 2005 stating Terry "had to seek medical treatment for her stress levels" (Doc. 41-7 at 2).

Even assuming Terry's depression qualifies as a disability under Ohio law, she cannot show Defendants knew or had reason to know of her disability during the period in question. True, she had complained of work-related stress at various times during her twenty years of employment, and told FCA nine years prior to her removal as team leader that she had sought medical treatment for her stress. But these intermittent complaints of work-related stress are a far cry from conveying to Defendants that she suffered from debilitating depression, particularly in the absence of any evidence that it restricted her ability to work prior to January 2014.

Aside from her inability to make out a *prima facie* case of discrimination, Terry also cannot show pretext for her removal. Defendants say FCA removed Terry from her position (and the Union later acceded to the removal) because (1) her team was consistently among the least efficient in the plant, (2) she did not have the respect of the team, and (3) she disrupted production by taking a magnetic tool home. In response, Terry offers the testimony of two fellow employees, who offer their opinion that Defendants unfairly sided with the team over Terry. Yet these co-workers neither profess nor show they have any personal knowledge of the reasons behind Terry's removal. Their testimony thus has no bearing on the question of whether Defendants' explanation has no basis in fact, did not actually motivate the removal, or was insufficient to motivate the removal. *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2013).

**Intentional Infliction of Emotional Distress**

Terry's final claim alleges Defendants "maintained a course of conduct calculated to permit ongoing and severe harassment . . . by co-workers and improperly removed her from her position as

9

Team Leader in a shocking and humiliating fashion" (Doc. 1-1 at 14). To succeed with this claim, Terry must establish: (1) Defendants intended to cause her emotional distress or should have known such serious emotional distress would result; (2) Defendants' conduct was outrageous, extreme, beyond all possible bounds of decency, and utterly intolerable in a civilized community; (3) Defendants' conduct proximately caused Terry's psychic injury; and (4) Terry's emotional distress is so serious that no reasonable person could be expected to endure it. *Talley*, 542 F.3d at 1110 (6th Cir. 2008) (interpreting Ohio law). "Clearly, not every wrongful act is outrageous. Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Brown v. Denny*, 72 Ohio App. 3d 417, 423 (1991).

The only specific instance Terry identifies as causing her psychic harm is her exchange with union officials Hepfinger, Dazell, and Epley in the union office in January 2014. The alleged behavior is unfortunate, but no reasonable jurist could conclude their conduct was so extreme as to rise to the level of outrageous conduct. *See Saucedo-Carrillo v. United States*, 983 F. Supp. 2d 917, 925 (N.D. Ohio 2013) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)) ("A court may also find as a matter of law that a defendant's conduct was not so severe and outrageous as to be sufficient for an IIED claim."), *aff'd*, ___ F. App'x ___, 2015 WL 4773258 (6th Cir. 2015).

## CONCLUSION

For these reasons, Defendants' Motions for Summary Judgment (Docs. 34 & 37) are granted.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

February 9, 2016